IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF GEORGIA

ROME DIVISION

**FILED IN CHAMBERS**
U.S.D.C. Atlanta

APR 1 4 2010

JAMES N. HATTEN, Clerk
By:
Deputy Clerk

UNITED STATES OF AMERICA          :
                                  :          CRIMINAL INDICTMENT
              v.                  :
                                  :          NO. **4'10CR12**
GEORGE D. HOUSER and              :
RHONDA HOUSER,                    :
      aka Rhonda Washington       :

THE GRAND JURY CHARGES THAT:

## COUNT ONE
### Conspiracy
### (18 U.S.C. § 1349)

1.    Beginning on a date which is unknown to the Grand Jury,
but at least as early as June 2004, and continuing thereafter until
in or about September 2007, in the Northern District of Georgia and
elsewhere, the defendants, GEORGE D. HOUSER and RHONDA HOUSER, aka
Rhonda Washington, did combine, conspire, confederate, agree, and
have a tacit understanding with each other and others known and
unknown to the Grand Jury, to knowingly and willfully execute and
attempt to execute a scheme and artifice to defraud the Medicare
program and the State of Georgia Department of Community Health,
Division of Medical Assistance ("Georgia Medicaid"), which are
health care benefit programs as defined in Title 18, United States
Code, Section 24(b), and to obtain by means of material false and
fraudulent pretenses, representations and promises, money and
property owned by, and under the custody and control of, the
Medicare program and Georgia Medicaid, in connection with the

delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347.

## BACKGROUND

At all times relevant to this Indictment:

### The Nursing Homes

2. Forum Healthcare Group, Inc. ("Forum Healthcare"), located at 940 Spider Webb Drive, Rome, Georgia, in the Northern District of Georgia, was created in or about March 2003 by defendant GEORGE D. HOUSER.  Through Forum Healthcare, defendant GEORGE D. HOUSER owned and managed the following three nursing homes:  Forum Healthcare Group, Inc. d/b/a Mount Berry Convalescent Center, which obtained its nursing home license in or about May 2003; Forum Healthcare Group, Inc. d/b/a Moran Lake Convalescent Center, which obtained its nursing home license in or about May 2003; and Forum Healthcare Group, Inc. d/b/a Wildwood Park Nursing and Rehabilitation Center, which obtained its nursing home license in or about August 2003.  (Hereafter the nursing homes will collectively be referred to as the "Nursing Facilities.")

3. In or about April 2004, defendant GEORGE D. HOUSER created Forum Group Corporation ("Forum Group"), located at 940 Spider Webb Drive, Rome, Georgia, in the Northern District of Georgia.

4. In or about July 2004, the Nursing Facilities changed names to: Forum Group at Mt. Berry Nursing & Rehabilitation Center,

LLC d/b/a Mt. Berry Nursing & Rehabilitation Center; Forum Group at Moran Lake Nursing & Rehabilitation Center, LLC d/b/a Moran Lake Nursing & Rehabilitation Center, LLC; and Forum Group at Wildwood Park Nursing & Rehabilitation Center, LLC d/b/a Wildwood Park Nursing & Rehabilitation Center, LLC.    Through Forum Group, defendant GEORGE D. HOUSER owned and managed the newly-named Nursing Facilities.    For purposes of this indictment, the names Mount Berry, Moran Lake and Wildwood will be used to describe the Nursing Facilities before and after the name changes.

5.    The Nursing Facilities were licensed nursing home facilities under federal and state law and were certified to participate in the Medicare and Georgia Medicaid programs.

6.    From May 1, 2003 through June 15, 2007, Mount Berry operated as a nursing home located at 2 Three Mile Road, Rome, Georgia, in the Northern District of Georgia.    Mount Berry was involuntarily terminated from participating in the Medicare and Medicaid programs on June 15, 2007, for failure to be in substantial compliance with participation requirements.

7.    From May 1, 2003 through June 15, 2007, Moran Lake operated as a nursing home located at 139 Moran Lake Road, Rome, Georgia, in the Northern District of Georgia.    Moran Lake was involuntarily terminated from participating in the Medicare and Medicaid programs on June 15, 2007, for failure to be in substantial compliance with participation requirements.

8.    From August 1, 2003 through September 13, 2007, Wildwood operated as a nursing home located at 2611 Wildwood Drive, Brunswick, Georgia.    Wildwood was involuntarily terminated from participating in the Medicare and Medicaid programs on September 13, 2007, for failure to be in substantial compliance with participation requirements.

9.    During the relevant period, each of the Nursing Facilities submitted claims for reimbursement to the Medicare and Georgia Medicaid programs and was assigned Medicare provider numbers and Georgia Medicaid provider numbers.

### George and Rhonda Houser

10.    Defendant GEORGE D. HOUSER  was the owner and chief executive officer of Forum Healthcare, Forum Group, the Nursing Facilities, and many other companies and corporations.  Defendant GEORGE D. HOUSER has a Juris Doctor degree but did not actively practice law while he was directing the Nursing Facilities' operations.

11.    Defendant RHONDA HOUSER, aka Rhonda Washington, was the Corporate Secretary of Forum Healthcare and Forum Group.    Along with defendant GEORGE D. HOUSER, defendant RHONDA HOUSER, aka Rhonda Washington, managed all of the details of the Nursing Facilities' administration.  Defendant RHONDA HOUSER, aka Rhonda Washington, is a licensed real estate agent who worked for Re/Max and earned commissions during certain times relevant to this

4

Indictment.

12.    Defendant GEORGE D. HOUSER and defendant RHONDA HOUSER, aka Rhonda Washington, were married on or about April 1, 2006.

### The Medicare Program and Georgia Medicaid

13.    The Medicare Program provides basic medical coverage to individuals age 65 years or older and to certain disabled persons. The Centers for Medicare and Medicaid Services ("CMS") (formerly the Health Care Financing Administration) is the federal agency within the United States Department of Health and Human Services ("HHS") charged with administering Medicare through its contractors.  Medicare reimbursed a nursing home for up to 100 days of skilled nursing care that followed a qualifying hospital stay. Medicare also paid for rehabilitation therapy and pharmacy costs for Medicare beneficiaries.

14.    Georgia Medicaid, administered by the Georgia Department of Community Health, Division of Medical Assistance (hereinafter, "DCH"), was established to provide an array of health care services and benefits to those who, due to economic circumstances, could not otherwise afford such health care services and benefits.  Georgia Medicaid is funded jointly by the State of Georgia and by HHS, acting through CMS, and paid for beneficiaries to reside in the Nursing Facilities and for certain medical expenses and prescription drugs.

15.    Nearly all of the residents at the Nursing Facilities

were Medicare or Georgia Medicaid recipients, meaning that Medicare and Georgia Medicaid were paying for nearly all of the per diem revenue that the Nursing Facilities were collecting, with minimal additional reimbursements provided by private insurance or other private sources.

**Federal Statutes and Regulations Governing Nursing Facilities**

16. The nursing home industry was a highly regulated industry structured to protect vulnerable individuals who did not require hospitalization, but nonetheless required some type of ongoing attention. Often the stay for a nursing home resident encompassed a long period of time, sometimes years. Nursing homes were required to operate in a manner that would enhance residents' quality of life by providing services and activities to attain and maintain the highest practicable physical, mental and psychosocial well-being of each resident in accordance with a written plan of care.

17. Federal statutes and regulations mandate that nursing facilities comply with federal requirements relating to the provision of services and quality of care. 42 U.S.C. § 1396r(b). "A nursing facility must care for its residents in such a manner and in such an environment as will promote maintenance or enhancement of the quality of life of each resident." 42 U.S.C. § 1396r(b)(1)(A). Additionally, nursing facilities "must provide services and activities to attain or maintain the highest

practicable physical, mental and psychosocial well-being of each resident in accordance with a plan of care which ... describes the medical, nursing, and psychosocial needs of the resident and how such needs will be met . . . ."    42 U.S.C. § 1396r(b)(2)(A); 42 C.F.R. § 483.25.

18. Nursing home providers may not submit claims for services that are "of a quality which fails to meet professionally recognized standards of health care."    42 U.S.C. § 1320c-5(a)(2).

19. A nursing facility must fulfill the residents' care plans by providing, or arranging for the provision of, nursing and related services and medically-related social services that attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident, pharmaceutical services, and dietary services that assure that the meals meet the daily nutritional and special dietary needs of each resident.    42 U.S.C. § 1396r(b)(4)(A)(i-iv).    The facility must also ensure that a resident maintains acceptable parameters of nutritional status, including body weight.    42 C.F.R. § 483.25.

20. A nursing facility must have sufficient nursing staff to provide nursing and related services to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident.    42 C.F.R. § 483.30.

21. A nursing "facility must be designed, constructed, equipped, and maintained to protect the health and safety of

residents, personnel and the public." 42 C.F.R. § 483.70.

22. Further, "[a] nursing facility must operate and provide services in compliance with all applicable federal, state and local laws and regulations ... and with accepted professional standards and principles which apply to professionals providing services in such a facility." 42 U.S.C. §§ 1396r(d)(4)(A).

23. Georgia state regulations also mandate certain standards of care for residents of nursing homes. State regulations require that facilities provide the same quality of care to a resident whose care is being paid for from Medicaid or Medicare funds as those residents whose care is being paid for from other sources. GCA § 290-5-39.07.

24. The Nursing Home Reform Act mandates that the state shall be responsible for certifying, in accordance with periodic surveys conducted by the state, the compliance of nursing facilities. 42 U.S.C. § 1396r(g)(1)(A).

25. The Nursing Facilities were periodically surveyed by the Georgia Department of Human Resources (DHR) Office of Regulatory Services (ORS) on behalf of HHS to ensure compliance with federal and state regulations. The ORS is responsible for performing the certification and survey function of nursing homes in Georgia on a periodic basis, and more frequently when there are complaints or other triggering events. Such surveys could result in deficiency citations by ORS, leading to enforcement actions ranging from fines

8

and civil monetary penalties to decertification from the Medicare and Medicaid programs.

26.   The Social Security Act mandates that nursing facilities that participate in the Medicare and Georgia Medicaid programs meet certain specific requirements in order to qualify for participation and receive taxpayer dollars from these programs.   These requirements are set forth at 42 C.F.R. § 483.1 et seq. and "serve as the basis for survey activities for the purpose of determining whether a facility meets the requirements for participation in Medicare and Medicaid."   42 C.F.R. § 483.1.

27.   Facilities that are not in compliance with the applicable federal and state rules and regulations are subject to sanctions including but not limited to denial of payment or termination of their right to provide services.

### Agreements with Medicare and Medicaid Programs

Medicare Agreements

28.   The Nursing Facilities submitted Provider/Supplier Enrollment Applications to Medicare on or about July 1, 2004. Enrolling as a provider of healthcare services allowed each nursing home to file claims for payment for services it provided to nursing home residents who qualified for Medicare funds.   Defendant GEORGE D. HOUSER signed each of the applications as President.

29.   In each of the nursing home's enrollment applications, defendant GEORGE D. HOUSER stated that he agreed to abide by

applicable Medicare laws and regulations and further certified:

> **I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.**

30. Defendant GEORGE D. HOUSER additionally signed Health Insurance Benefit Agreements with the Secretary of HHS for the Nursing Facilities. Defendant RHONDA HOUSER, aka Rhonda Washington, also signed a Health Insurance Benefit Agreement for the Wildwood facility. The Health Insurance Benefit Agreements state that "[i]n order to receive payment under Title XVIII of the Social Security Act," the facility "agrees to conform to the provisions of Section 1866 of the Social Security Act and applicable provisions in 42 CFR."

Medicaid Agreements

31. To be eligible to receive Georgia Medicaid payments, the Mount Berry and Moran Lake facilities submitted Georgia Medicaid Enrollment Applications on or about April 29, 2003. Defendant RHONDA HOUSER, aka Rhonda Washington, was listed as the "Office Manager" for both facilities. In the applications, defendant RHONDA HOUSER, aka Rhonda Washington, certified that: the information supplied in the applications was accurate and complete; that she understood any falsification, omission or misrepresentation could be punishable by criminal, civil or other actions; and, that she had read all Medicaid manuals relevant to

10

the Categories of Service that the facilities would provide
(Nursing Facilities, Skilled and Intermediate Care). Each
application also included a Statement of Participation in which the
facility acknowledged that payment of claims submitted by the
facility would be from federal and state funds.

32. The Wildwood facility submitted its Georgia Medicaid
Enrollment Application on or about August 1, 2003. Defendant
RHONDA HOUSER, aka Rhonda Washington, was listed as the Office
Manager for the facility and was also listed as an individual
having a direct or indirect ownership or a controlling interest in
the entity.

33. On or about June 30, 2004, about the same time the names
of each facility were changed, each facility resubmitted Georgia
Medicaid Enrollment Applications. Defendant GEORGE D. HOUSER was
listed as the Office Manager for all three facilities, and was also
listed as an individual having a direct or indirect ownership or a
controlling interest in all three entities.

34. Attached to the Georgia Medicaid Enrollment Application
for each facility was an Electronic Funds Transfer Agreement, which
provided for each facility to receive Medicaid funds
electronically. The agreement stated that providers receiving
Medicaid payments of claims "shall abide by all federal and state
laws governing the Medicaid program." Defendant RHONDA HOUSER, aka
Rhonda Washington, signed the Electronic Funds Transfer Agreement

11

for the Mount Berry and Moran Lake Enrollment Applications submitted on or about April 29, 2003. Defendant GEORGE D. HOUSER signed the Electronic Funds Transfer Agreement for the Mount Berry, Moran Lake, and Wildwood Enrollment Applications submitted on or about June 30, 2004.

35. Beginning on or about May 1, 2003, the Nursing Facilities submitted electronic claims to Medicare and Medicaid for payment. The Nursing Facilities submitted their claims for payment electronically. Each electronic claim contained the following notices:

> NOTICE: ANYONE WHO MISREPRESENTS OR FALSIFIES ESSENTIAL INFORMATION REQUESTED BY THIS FORM MAY UPON CONVICTION BE SUBJECT TO FINE AND IMPRISONMENT UNDER FEDERAL AND/OR STATE LAW.

> For Medicaid purposes:

> This is to certify that the foregoing information is true, accurate, and complete. I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State Laws.

## MANNER AND MEANS

36. It was part of the conspiracy and scheme and artifice to defraud that the defendants submitted or caused the submission of claims to Medicare and Medicaid that falsely represented that the Nursing Facilities had provided the care, services and environment required by Medicare and Medicaid, when the care, services and

environment provided by the Nursing Facilities were so inadequate or deficient as to constitute worthless services.

## The Governing Body and Administration

37.    The Nursing Facilities were required to have persons functioning as a governing body that is legally responsible for establishing and implementing policies regarding the management and operation of the facility.    42 C.F.R. § 483.75.    The governing body, in this case the defendants, is supposed to appoint an administrator who is responsible for the daily management of the facility.

38.    The Nursing Facilities had a number of different administrators during the conspiracy.    The administrators constantly alerted the defendants about the conditions at the Nursing Facilities through an almost daily stream of telephone calls, e-mails and faxes, yet the defendants affirmatively ignored these alerts, sometimes throwing away faxes from the administrators without ever reading them.    Some of the administrators quit due to their frustration about the defendants' lack of concern about the substandard conditions at the facilities.

## Inadequate Staffing Levels at the Nursing Facilities

39.    The Nursing Facilities were required to have "sufficient nursing staff to provide nursing and related services to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident, as determined by resident assessments

13

and individual plans of care." 42 C.F.R. § 483.30.

40. At various times, the Nursing Facilities maintained staffing at inadequate levels to provide needed care, and thereby jeopardized the health and physical condition of residents. The inadequate staffing was largely attributable to the defendants failure to pay the Nursing Facilities' employees on a timely basis.

41. The defendants stopped depositing the full amount of payroll in late 2004 and payroll checks started bouncing on a consistent basis. This situation became worse in 2005 when the defendants decreased the deposits even further and sometimes did not make timely deposits. Employees called the payroll manager to complain about the bounced checks, and the payroll manager would relay those complaints to the defendants.

42. On February 3, 2006, the administrators of the Nursing facilities faxed a memo to the defendants requesting that they assure more reliability with employees' payroll to avoid the problems they were having with payroll every two weeks.

43. On June 16, 2006, the Mount Berry administrator sent a fax to the defendants telling them that, because of the serious problems with payroll and bounced checks, she and her staff would no longer sign any payroll checks unless they were assured that the bank had sufficient funds to cover the checks.

44. On July 5, 2006, the administrator at Mount Berry sent a fax to the defendants informing them that she had received several

14

management resignations because of the unacceptable payroll situation.

45. As a result of the issues with payroll, the defendants started using a mobile check cashing service, EMK Group Limited ("EMK"), in or about July 2006. When the "money van" showed up at the Nursing Facilities, employees would run out to the van to get their checks cashed.

46. EMK typically cashes employee payroll checks and charges the employer a fee to use the service. Before the close of the next business day, EMK deposits the payroll checks into its bank account. Initially, the one percent service fee that EMK charged was taken out of the employees' paycheck. The employees became very upset and defendant GEORGE D. HOUSER eventually paid the one percent fee.

47. By the third time the EMK service was used, some of the payroll checks issued by the defendants bounced. In or about December 2006, a $120,000 check from FORUM HEALTH CARE to EMK bounced. Defendant GEORGE D. HOUSER subsequently met with the owner of EMK and agreed to pay an additional $5,000 each time the payroll was processed by the service, which was to be applied to the $120,000 defendant GEORGE D. HOUSER owed due to the bounced check.

48. Defendant GEORGE D. HOUSER thereafter signed a promissory note for $117,500 to EMK and the service continued to do business

with Houser in order to recoup the $120,000 it was owed.  EMK never received all of the money it was owed and was owed at least $32,000 by defendant GEORGE D. HOUSER when the Nursing Facilities were closed.

49.  At various times during the conspiracy, the defendants did not pay employees' Social Security taxes, payroll taxes or health insurance premiums, although these items were deducted from the employees' paychecks.

50.  On July 13, 2005, the administrator at Mount.Berry sent a fax to defendant GEORGE D. HOUSER informing him that employees were claiming that money was being deducted from their paychecks for insurance, but that their insurance had not been paid.

51.  On September 14, 2005, the administrator at Mount Berry sent a fax to defendant GEORGE D. HOUSER informing him that employees were complaining about their insurance claims not being paid and being told that they did not have insurance when they went to see their doctor.

52.  The administrators and other employees constantly had to purchase food, bread, milk and various supplies and pay for various repairs at the Nursing Facilities with their own money and then request reimbursement for these purchases from the defendants.

53.  When the administrator at Mount Berry inquired about reimbursement for purchases she had made, including an igniter for a water heater that was not working, she received an e-mail on

16

December 28, 2006, from the corporate office stating that "employees should not be using personal funds to operate the business," and that it was unclear when she would be reimbursed. Both defendants were copied on this e-mail.

54. The lack of nursing and other staff at the Nursing Facilities at various times between 2003 and 2007, largely attributable to the defendants' failure to pay the Nursing Facilities' employees, directly caused and contributed to care at the Nursing Facilities that failed to meet professionally recognized standards of health care and that was so deficient, inadequate, and substandard as to constitute worthless services.

## Failure to Pay Vendors

55. On numerous occasions, the defendants owed considerable sums to many Nursing Facility vendors through consistent delinquency in payment or failure to pay despite promises and representations to the contrary. Defendants curtailed crucial services provided to residents by failing to pay the vendors who provided such services.

56. The administrators of the Nursing Facilities urgently requested, through telephone calls, e-mails and faxes, that the defendants pay delinquent invoices from vendors, and warned the defendants that the failure to pay vendors could put residents in jeopardy, but the defendants ignored the requests and routinely failed to pay the expenses of the Nursing Facilities as they became

17

due including, at various times, expenses such as food, clinical laboratory services, medical waste disposal, trash disposal, pharmacy services, and various nursing supplies, as well as repair costs for washing machines and dryers, water heaters, air conditioners, and a leaking roof.

57.  Defendant GEORGE D. HOUSER was well aware of the negative impact that his failure to pay the vendors was having on the operation of the Nursing Facilities.  Defendant GEORGE D. HOUSER received a letter dated December 13, 2004, from the service monitoring the fire alarm system at Mount Berry notifying him that it had discontinued service because of outstanding invoices.  After receiving this letter, Defendant GEORGE D. HOUSER sent an e-mail to the administrator at Mount Berry on December 15, 2004, to which he attached a list of vendor payments that he claimed he was going to make and stated that:

> I'm planning to pay these early next week to return the home to normalcy.  Would this do it?  Is anyone left off the list that should be on it?  Is anyone on the list that should be left off?  I'm doing this because I don't want the State to think I am not paying the bills and try to remove Forum, although some apparently think they should.

58.  The Nursing Homes were always suffering from food shortages.  Based on the number of residents at Mount Berry and Moran Lake, the two facilities were spending significantly less on food per resident than the national average.

59.  In June 2005, the Mount Berry and Moran Lake facilities

18

began using Sysco Food Services ("Sysco") of Atlanta for delivery of food for the residents because the previous vendor, U.S. Foodservice, would no longer supply the facilities due to the money it was owed.

60.   When Sysco first started providing service, it required that defendant GEORGE D. HOUSER make payment for the goods at the time of delivery (Cash On Delivery), but after checks started bouncing, it started requiring cashier checks.

61.   Sysco constantly had problems with payments and a number of times notified the defendants that the accounts were seriously past due and that they might not be able to continue supplying food.   In response to Sysco's concerns, in June 2006, defendant GEORGE D. HOUSER sent Sysco a signed personal financial statement dated as of May 2, 2006.   The personal financial statement indicated that defendant GEORGE D. HOUSER's net worth was more than $26 million.

62.   Georgia Power was owed a significant amount of money for the Mount Berry and Moran Lake facilities.   The defendants would continually make arrangements with Georgia Power to make payments pertaining to the two facilities, but would not follow through with the agreements they made.

63.   Georgia Power was reluctant to immediately cut off the power usage and utilities at the facilities because it was aware that the facilities were nursing homes.   Beginning in or about

January 2007, Georgia Power started cutting power off at locations within the facilities that it believed would not directly impact on the residents' immediate health and welfare, such as the laundry room and storage areas. Georgia Power also cut off power at Forum Group's corporate office.

64. Defendant GEORGE D. HOUSER repeatedly told Georgia Power that he would pay what Georgia Power was owed, but Georgia Power never received the payments he assured them he would make, and was owed approximately $283,000 at the time the facilities were closed.

65. The failure to pay vendors directly caused and contributed to care at the Nursing Facilities that failed to meet professionally recognized standards of health care and that was so deficient, inadequate, or substandard as to constitute worthless services.

### The Diversion of Funds

66. It was further part of the conspiracy and scheme and artifice to defraud that Medicare and Medicaid provided funds to the defendants based upon the material misrepresentations made by the defendants that they would provide and had provided care, services, and environment to the Nursing Facility residents in accordance with the Provider Agreements and all applicable laws and regulations. The defendants made these material misrepresentations knowing that they intended to improperly divert funds from the Nursing Facilities into their own personal bank accounts to pay for

20

personal business ventures and other personal expenses, instead of paying vendors and other expenses of the Nursing Facilities.

67.    Soon after defendant GEORGE D. HOUSER started operating and managing the Nursing Facilities, the defendants took over complete control of the facilities' bank accounts. Corporate bank accounts under the names Forum Healthcare Group and Forum Group Management Services were used by the defendants to process Medicare and Medicaid funds and to pay the Nursing Facilities' expenses. The administrators who previously had access to the bank accounts were locked out of the accounts.

68.    In or about January 2004, defendant GEORGE D. HOUSER wrote two checks from the Forum Healthcare Group account for $63,882 and $76,586 to purchase a Mercedes E500 automobile and a Mercedes S430 automobile to be used by defendant RHONDA HOUSER, aka Rhonda Washington and him.

69.    From in or about October 2004 to in or about October 2005, the defendants caused a number of payments to be sent from the Forum Healthcare Group payroll account to defendant GEORGE D. HOUSER's ex-wife, P.H., typically every two weeks in the amount of $3,552.15. Defendant RHONDA HOUSER, aka Rhonda Washington, signed a majority of the checks. P.H. received a total of approximately $71,490.85 in payments from Forum Healthcare Group even though P.H. was never an employee of Forum Healthcare Group or any of the Nursing Facilities.

70. From in or about January 2005 to in or about May 2005, the defendants caused payments to be sent from the Forum Healthcare Group payroll account and another Forum Group account to M.C., who was providing day care and evening care for the defendants' children. M.C. received payments totaling approximately $10,566.76. Defendant RHONDA HOUSER, aka Rhonda Washington, signed a majority of the checks. M.C. was listed as a receptionist in the payroll system but never worked as a receptionist.

71. From in or about July 2004 to in or about June 2005, the defendants caused numerous payments to be made to defendant RHONDA HOUSER, aka Rhonda Washington for her personal use. In total, defendant RHONDA HOUSER, aka Rhonda Washington, received at least $100,000 in checks, wires or transfers from the Forum Healthcare Group and Forum Group management accounts. The checks were signed by either defendant GEORGE D. HOUSER or defendant RHONDA HOUSER, aka Rhonda Washington, depending on the date issued.

Real Estate Purchases

72. On or about June 14, 2004, defendant GEORGE D. HOUSER transferred $1,400,000 from the Forum Healthcare Group bank account to a personal account in his name. Two weeks later, on or about June 30, 2004, defendant GEORGE D. HOUSER purchased property at 427 Chulio Road, Rome, Georgia. The contract sales price for the property was $650,000. The borrower listed on the settlement statement was The Guild, Incorporated ("The Guild"), a company

owned by defendant GEORGE D. HOUSER, who signed as the Buyer. Defendant GEORGE D. HOUSER paid approximately $353,000 at closing towards the purchase.    Defendant RHONDA HOUSER, aka Rhonda Washington, was listed in the Purchase and Sale Agreement, under the name Rhonda Washington, as the Re/Max selling broker representing the Buyer, defendant GEORGE D. HOUSER, and received a commission of $24,824.

73.   On or about July 29, 2004, defendant GEORGE D. HOUSER purchased a house for P.H., GEORGE D. HOUSER's ex-wife, in the Atlanta, Georgia metropolitan area.    The contract sales price for the property was $1,349,000.    Defendant GEORGE D. HOUSER paid approximately $716,000 at closing towards the purchase of the property.    Defendant RHONDA HOUSER, aka Rhonda Washington, was listed in the Purchase and Sale Agreement, under the name Rhonda Washington, as the Re/Max designated agent representing the Buyer, defendant GEORGE D. HOUSER, and received a commission of $39,660.

74.   On or about December 21, 2004, defendant GEORGE D. HOUSER purchased property at Highway 411 in Rome, Georgia.    The contract sales price for the property was $1,040,000.    The borrower listed on the settlement statement was Roma Development Company, L.L.C. ("Roma Development"), another company owned by defendant GEORGE D. HOUSER, who signed as the Buyer and paid nearly the entire amount of the purchase price at closing.    Defendant RHONDA HOUSER, aka Rhonda Washington, under the name Rhonda Washington, was listed in

the Purchase and Sale Agreement as the Re/Max selling broker representing the Buyer, defendant GEORGE D. HOUSER, and received a commission of $31,200.

75. On or about February 7, 2005, defendant GEORGE D. HOUSER purchased property at 209 Tuckawana Drive, Rome, Georgia. The contract sales price for the property was $500,000. The borrower listed on the settlement statement was Roma Development. Defendant GEORGE D. HOUSER paid approximately $300,000 at closing towards the purchase of the property. Defendant RHONDA HOUSER, aka Rhonda Washington, under the name Rhonda Washington, was listed in the Purchase and Sale Agreement as the Re/Max selling broker representing the Buyer, defendant GEORGE D. HOUSER, and received a commission of $6,000.

76. On or about July 12, 2005, defendant GEORGE D. HOUSER purchased property at 147 Tuckawana Drive, Rome, Georgia. The contract sales price for the property was $360,000. Defendant GEORGE D. HOUSER paid nearly the entire amount of the purchase price at closing. Defendant GEORGE D. HOUSER used two Medicare checks totaling $71,617.10 as earnest money for this purchase by signing them over directly to the sellers, who deposited them. One of the Medicare checks, in the amount of $34,309.54, was payable to the Forum Group at Moran Lake. The other Medicare check, in the amount of $37,307.56, was payable to Forum Group at Mount Berry. The borrower listed on the settlement statement was Roma

Development.    Defendant GEORGE D. HOUSER signed the settlement
statement as the Buyer.    Defendant RHONDA HOUSER, aka Rhonda
Washington, received a commission of $8,635.

The Marriott Hotel Development

77.   Beginning at least as early as February 2005, defendant
GEORGE D. HOUSER, as President and Chief Executive of Forum Group,
expressed his interest in building and owning a Marriott hotel and
sent a presentation to a Senior Vice President of Marriott
International that proposed building a Marriott Courtyard in Rome,
Georgia on the Rome property that Houser had already purchased and
was about to purchase.

78.   The proposal to Marriott listed defendant RHONDA HOUSER,
aka Rhonda Washington, as Vice-President and Director of Human
Resources and Marketing at the Forum Group.  It did not mention her
position or experience in the nursing homes, stating instead that
she is a licensed real estate broker and executive, who had
developed, constructed and sold residential and commercial
properties in the Rome and Atlanta markets for the past twelve
years.

79.   On or about May 17, 2005, defendant GEORGE D. HOUSER sent
the Marriott executive an e-mail updating him on the land
development in Rome, which he called ROMA.   In his e-mail, GEORGE
D. HOUSER stated that the new hotel would cost between seven and
eight million dollars.  Defendant GEORGE D. HOUSER further stated

that he also had an interesting prospect for a hotel in Brunswick, Georgia, and was investigating the possibility of acquiring the $9.2 million site for that hotel.

80. Attached to the May 17, 2005 e-mail from defendant GEORGE D. HOUSER was a Cash Flow Analysis for the three nursing homes for the preceding four months (January-April 2005). The analysis reflected that the nursing homes had a positive cash flow of $1,300,486.08.

81. On or about July 12, 2005, defendant GEORGE D. HOUSER sent a letter to the Marriott executive indicating that Forum Group would capitalize with $4.9 million, or 50% equity, a new lodging company that would build a Marriott hotel at the development he called "Waterplace in Roma." Defendant GEORGE D. HOUSER projected the total cost of the hotel as $9.8 million. Marriott never entered into a contract with defendant GEORGE D. HOUSER.

## Poor Conditions at the Nursing Facilities

82. ORS received numerous complaint calls from families, staff and vendor companies about the conditions in the Nursing Facilities. Vendors were complaining that they were not being paid and families and employees were calling with the same type of complaints. The Nursing Facilities had numerous problems that were documented by repeated cited deficiencies in the ORS surveys, including significant weight loss by many of the residents.

83. After ORS cited deficiencies, the Nursing Facilities

26

represented to ORS, through a plan of correction, that the
deficiencies would be corrected.

84.  Often the deficiency would re-occur and the ORS would
again cite the Nursing Facility, which had either temporarily
corrected the deficiency or promised that the deficiency would be
corrected but failed to make the correction.

85.  In or about May 2007, due to an increase in the volume
and severity of complaints, ORS survey teams were dispatched to
both Moran Lake and Mount Berry.

86.  A survey performed at Moran Lake on May 23, 2007,
identified five "immediate jeopardies" and multiple other
deficiencies.  Immediate jeopardy tags are given by surveyors in a
situation in which the "provider's noncompliance with one or more
requirements of participation has caused, or is likely to cause,
serious injury, harm, impairment, or death to a resident."   42
C.F.R. § 489.3.   The five immediate jeopardy tags identified
related to:

     a.    Sanitary conditions with respect to food
          preparation and service;

     b.    Infection control and the failure to ensure the
          process & handling of laundry and linen in a manner
          that prevented the potential spread of infection;

     c.    Governing Body failed to ensure the
          provision/payment of basic necessities to ensure
          kitchen and laundry sanitation, as well as dietary
          and environmental needs of the residents;

     d.    Facility failed to maintain a quality assurance
          program that identified and implemented corrective

measures for repetitive and long term problems;

e.  Facility failed to ensure that automatic release door mechanisms were functioning properly to allow residents & staff to exit the building during emergencies

87.  A survey conducted at Mount Berry on May 23, 2007, identified two immediate jeopardies tags, for nutrition and administration, and 19 other deficiencies.

88.  After the May 23, 2007 surveys at Moran Lake and Mount Berry, CMS sent a letter to the administrators of each facility on June 8, 2007.  The letters included formal findings from the surveys and a directed plan of correction that listed specific corrections and remedies the facility was required to take.  The letters further advised the facilities that substantial compliance must be achieved by June 15, 2007.

89.  On June 15, 2007, CMS sent letters to the Moran Lake and Mount Berry facilities notifying each administrator of the involuntary mandatory termination of their respective facility, effective immediately.  The letters referred to the deficiencies found during the surveys conducted on May 23, 2007.

90.  On August 20, 2007, ORS conducted a revisit survey at Wildwood, and determined that, while the immediate jeopardy to resident health and safety that had been identified during a survey two weeks earlier had been removed, the facility was still not in substantial compliance with the federal requirements for nursing homes participating in Medicare and Medicaid programs.  The

facility was directed to adhere to a plan of correction.

91.   Another survey that was started on September 4, 2007, again found that the Wildwood facility was not in substantial compliance with participation requirements and that conditions in the facility constituted immediate jeopardy.   As a result, on September 10, 2007, CMS sent a letter to the Wildwood administrator informing her of the involuntary mandatory termination of the Wildwood facility.

## False Claims to Medicare and Medicaid

92.   From June 1, 2004, until on or about September 7, 2007, the Nursing Facilities submitted or caused to be submitted false or fraudulent claims to the Medicare and Georgia Medicaid programs for services that were worthless in that they were not provided or rendered, were deficient, inadequate, substandard, and did not promote the maintenance or enhancement of the quality of life of the residents of the Nursing Facilities, and were of a quality that failed to meet professionally recognized standards of health care.

93.   Defendants had actual knowledge that the Nursing Facilities were providing inadequate care and that claims for reimbursement were being submitted for services that were so inadequate or deficient as to constitute worthless services.

94.   During the relevant period, the Nursing Facilities perpetrated a fraud on the United States by making materially false representations in the submission of the Medicare and Georgia

29

Medicaid claims.

95.  As a result of the conspiracy and scheme to defraud, defendants GEORGE D. HOUSER and RHONDA HOUSER, aka Rhonda Washington, fraudulently caused more than $30 million in claims to be paid by Medicare and Georgia Medicaid for care and services that were either not rendered or were so inadequate or deficient as to constitute worthless services.

All in violation of Title 18, United States Code, Section 1349.

## COUNTS TWO THROUGH NINE
### Failure To Account For And Pay Over Payroll Taxes
### (26 U.S.C. § 7202)

96.  The Grand Jury re-alleges and incorporates by reference paragraphs 2 through 95 of this Indictment as if fully set forth herein.

97.  On or about the dates listed below in Column A, in the Northern District of Georgia, the defendant, GEORGE D. HOUSER, president, general counsel, and responsible corporate officer for the entities listed in Column B, all with their principle place of business or corporate headquarters in Rome, Georgia, did, during the quarter ended on the date listed in Column C, willfully fail to truthfully account for and pay over to the Internal Revenue Service the federal income taxes and Federal Insurance Contributions Act taxes due and owing to the United States of America in the amounts listed in Column D, all in violation of Title 26, United States

30

Code, Section 7202.

| Count | (A)<br>Date Filed<br>Form 941 | (B)<br>Entity Name | (C)<br>Quarter<br>Ended | (D)<br>Payroll<br>Taxes Owed |
|---|---|---|---|---|
| 2 | 08/11/2004 | Forum Healthcare Group, Inc. | 03/31/2004 | $214,934 |
| 3 | 02/28/2005 | Forum Group Inc. @ Moran Lake Nursing & Rehab | 12/31/2004 | $65,792 |
| 4 | 02/28/2005 | Forum Group Inc. @ Mount Berry Nursing & Rehab | 12/31/2004 | $83,542 |
| 5 | 02/28/2005 | Forum Group Inc. @ Wildwood Park Nursing & Rehab | 12/31/2004 | $153,177 |
| 6 | 08/18/2005 | Forum Group Management Services, Inc. | 06/30/2005 | $12,495 |
| 7 | 08/18/2005 | Forum Group @ Moran Lake Nursing & Rehab, LLC | 06/30/2005 | $58,001 |
| 8 | 08/18/2005 | Forum Group @ Mount Berry Nursing & Rehab, LLC | 06/30/2005 | $77,269 |
| 9 | 08/18/2005 | Forum Group @ Wildwood Park Nursing & Rehab Center | 06/30/2005 | $141,095 |

TOTAL PAYROLL TAXES COLLECTED BUT NOT PAID TO THE IRS: **$806,305**

## COUNT TEN
### Failure to File Individual Income Tax Return
### (26 U.S.C. § 7203)

98.    The Grand Jury re-alleges and incorporates by reference paragraphs 2 through 95 of this Indictment as if fully set forth herein.

31

99.   On or about April 15, 2005, in the Northern District of Georgia and elsewhere, defendant GEORGE D. HOUSER, having his principle place of business in Rome, Georgia, and having received gross income in excess of $7,950 during calendar year 2004 and therefore being required to make an income tax return with the United States, did willfully fail to make an income tax return, all in violation of Title 26, United States Code, Section 7203.

### COUNT ELEVEN
### Failure to File Individual Income Tax Return
### 26 U.S.C. § 7203

100.   The Grand Jury re-alleges and incorporates by reference paragraphs 2 through 95 of this Indictment as if fully set forth herein.

101.   On or about April 17, 2006, in the Northern District of Georgia and elsewhere, defendant GEORGE D. HOUSER, having his principle place of business in Rome, Georgia, and having received gross income in excess of $8,200 during calendar year 2005 and therefore being required to make an income tax return with the United States, did willfully fail to make an income tax return, all in violation of Title 26, United States Code, Section 7203.

## FORFEITURE PROVISION

102.   Upon conviction of the offenses alleged in Count One of this Indictment, defendants GEORGE D. HOUSER and RHONDA HOUSER, aka Rhonda Washington, shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(7), any and all property, real and personal, constituting, or derived from, gross proceeds obtained directly or indirectly, as a result of the violation(s).

103.   If, as a result of any act or omission of the defendant, any property subject to forfeiture:

> a.   cannot be located upon the exercise of due diligence;
>
> b.   has been transferred or sold to, or deposited with, a third person;
>
> c.   has been placed beyond the jurisdiction of the Court;
>
> d.   has been substantially diminished in value; or
>
> e.   has been commingled with other property which cannot be subdivided without difficulty;

the United States intends, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18 United States Code, Section 982(b), to seek forfeiture of any other property of

said defendant up to the value of the forfeitable property described above.

A _____ BILL

_____
FOREPERSON

SALLY QUILLIAN YATES
UNITED STATES ATTORNEY

GLENN D. BAKER
ASSISTANT UNITED STATES ATTORNEY
Georgia Bar No. 033450

WILLIAM G. TRAYNOR
ASSISTANT UNITED STATES ATTORNEY
Georgia Bar No. 716634

600 U.S. Courthouse
75 Spring Street, S.W.
Atlanta, GA 30303
404/581-6000